[Civ. No. 12550.   Second Appellate District, Division Two.—June 28, 1940.]

R. J. HEARD et al., Appellants, v. BOARD OF ADMINIS-TRATION OF ALL CITY EMPLOYEES' RETIRE-MENT SYSTEM OF THE CITY OF LOS ANGELES, et al., Respondents.

Loren A. Butts for Appellants.

Ray L. Chesebro, City Attorney, F. Von Schrader, Assistant City Attorney, and Robert J. Stahl, Deputy City Attorney, for Respondents.

MOORE, P. J.—From a judgment denying them the status of ''employees'' of the city of Los Angeles plaintiffs appeal.

Plaintiffs have for some time been owners of trucks which for definite compensations they drove for the city of Los Angeles. Herman entered the city service in 1911. At first

he furnished a team to be used on a grader which he operated under the supervision of the foreman while another man drove the horses. This he continued for six years, receiving his pay twice a month on a daily rate. In 1917 he purchased a truck to haul materials for the street department, where he was again under the control of the foreman. In 1928 he was injured in the course of duty, for which he was compensated and his physician paid by the city. He was allowed vacations with pay until 1932. He was paid about $4,000 annually from 1930 to 1936. In 1936 he ceased to operate his truck and employed a substitute driver. From 1930 to 1936 his two sons operated the truck a total of 641 days. He is not permitted to drive a truck for another while his own is in the service of the city.

Prior to June 1, 1921, Heard worked for a private concern, while one H. J. Fox was in the service of the city. On said date they exchanged jobs, when Heard began to work for the city at a maintenance plant on ''permit work'', which consisted of repairing pavements that had been cut to install utilities. He hauled rock, gravel and oil and took orders from the foreman. He continued there until 1932, although he had done extra jobs in picking up after storms and in cleaning streets and transporting debris. For a while after 1931 he drove to the dirt piles, where dirt was shoveled into his truck to be delivered to points designated by the foreman. In more recent years he has operated a service truck, hauling such supplies as were required by the foreman. He took orders from the foreman as to when to begin his work, when to quit and what to do. In 1937 he was ill for a period, during which he was allowed to employ a substitute driver for 90 days. Prior to 1932 he took vacations with pay, but none has been allowed him since then. At the beginning, his compensation was $375 per month, later raised to $381.50. Since July 1, 1932, he has been paid on an hourly basis.

During the six months prior to July 1, 1925, both Heard and Herman continuously did the same work they did subsequent to said date on which certain charter provisions operated to give civil service status to employees who had been in the service during said six months' period. They were first employed under the authority of the standardization ordinance, code No. 8592 V, which authorized the board of public works to employ truck owners at a rate of $381.50

per month for a four-yard five-ton automatic dump truck. On and after July 1, 1932, they were employed pursuant to the authority of ordinance 71539 and ordinances 74088, 75964 and 76191, which are amendatory of said ordinance 71539. Said ordinance and amendments contain the specifications for dump trucks, fix the rates of pay according to the capacities of the truck and require the driver of the vehicle to perform such work as may be assigned to him by the city engineer.

In 1937 article XXXIV was added to the city charter, providing a plan for the retirement of city employees. Subdivisions A and B of section 502 thereof (Stats. 1937, p. 2945) read as follows:

"A. All employees in city service in the classified Civil Service of the city under the provisions of this charter, on the 1st day of July, 1937, shall become members of said retirement system, and all persons entering the city service as Civil Service employees after said date shall, upon the expiration of their probationary period, become members of said system; provided that any employee who would be excluded from membership under the foregoing provisions may become a member of the system upon filing with the Board of Administration a written declaration of his desire to become such member, such written declaration to be filed within thirty (30) days after July 1, 1937, as to all persons in the city service on said date, and within thirty (30) days after the commencement of such city service in the case of all employees entering the service after said date. In the event of such declaration being filed, membership in said system shall be effective, for all purposes of this Article, as of the said 1st day of July, 1937, or as of the date of entry into city service, as the case may be. Nothing herein contained, however, shall permit the inclusion in said system of those persons excluded by the provisions of subdivision B of this section.

"B. The following employees shall not become members of said retirement system:

" (1) Elective officers;

" (2) All appointive officers, other than those holding full time positions at a regular salary, wage or compensation fixed by this charter or by ordinance. Nothing in this subsection, however, shall be deemed to exclude the employee members of the Board of Administration created by this Article.

"(3) Those members or employees of the Fire Department and the Police Department who are entitled to benefits under the provisions of Article XVII of this charter; the employees of the Department of Water and Power, entitled to benefits under the general plan and system authorized under the provisions of Sec. 220.1 of this charter.

"(4) The employees of the Board of Education, of the Advisory Borough Boards, of the Board of Trust Commissioners, of the Municipal Housing Commission, and of any other board or department now or hereafter excluded by this charter from pension provisions.

"(5) Employees appointed to temporary positions other than employees who, at the time of such appointment, are not members of said retirement systems.

"(6) Employees serving under emergency appointment to positions in the classified Civil Service who, at the time of such appointment, are not on a leave of absence from a Civil Service position.

"(7) Inmates of city institutions who are allowed compensation for such services as they are able to perform.

"(8) Persons in city institutions principally for the purpose of receiving training but who receive compensation.

"(9) Persons employed under contract for a definite period or for the performance of a particular special service.

"(10) Employees serving on a part-time basis of less than one-half (½) time."

Subdivision C of section 508 provides for the amount of compensation for those retired under subdivision B of that section.

By virtue of said section plaintiffs contend that they are entitled to become members of said retirement system, having survived the age of sixty years, having completed ten or more years continuous service and having filed with said board of administration a written application for retirement pursuant to the provisions of said subsection B.

Thus plaintiffs present a single question for our determination, viz., whether they are "employees of the city of Los Angeles within the intent and meaning of Article XXXIV of the charter". In their attempt to demonstrate that they are employees they stand upon section 501 of the charter and undertake (1) to show, by reason and authority, that they are employees within the purview of said section, and (2) that by the provisions of section 121 of article IX, adopted

July 1, 1925 (Stats. 1925, p. 1069), they were blanketed into the classified civil service, as a result of which, they say, they would automatically be entitled to retire.

Prior to the adoption of the rule of 1935 requiring that the truck owner personally operate his truck unless he first obtained a special permit for a sub-driver, it was the common practice to employ substitute drivers. Before the new rule no record was kept of the days the owner himself actually drove his truck. The use of such substitute drivers still continues. In March of 1939 the city had on its books 71 truck owners. Of these, 25, or 35 per cent, had permanent sub-drivers. Twenty-two of those were authorized prior to July 1, 1937. Fifteen of them were allowed because of the physical inability of the owner to operate his own truck. There are 10 sub-drivers on account of the death of the owners. Plaintiff Herman has had a permanent substitute since August 24, 1936. Of the entire list of 71 only 4 are limited as to the terms of their tenures, 2 owners were temporary ill and 2 were on brief vacations. From this view of the city's list of truck owners servicing the city, they do not bear the aspect of employees according to the charter and ordinances of the city, but rather of independent contractors. (502–B9 of the charter.)

Appellants claim that they are employees because of the fact that they were directed in the performance of their tasks by the foreman and city engineer. But from the evidence it appears that the orders to plaintiffs were only with reference to materials requiring transportation. To use a truck thus rented to economic advantage is possible only by having it serve the requirements as they arise. Where the engineer is obliged for public safety promptly to fill and repave excavations or ditches on the streets, it would be impracticable to contract with a truck owner to haul materials to the street and the surplus dirt to a dump at a price per ton. A truck might be without work for an indefinite time. Since the truck owner may be directed from one place to another, to operate his truck, he is kept busy without being required to work as a laborer. Neither plaintiff has worked otherwise than as driver of his truck.

Plaintiffs argue that because they have completed more than ten years of continuous service, as defined in article XXXIV, 508–B, they are employees regardless of

whether their positions are classed as "an office or employment" (Charter, sec. 501), and notwithstanding the specifications as to who shall not become members of the system, as provided in section 502–B. It was the purpose of said article XXXIV to provide "a means whereby superannuated public employees may be replaced" (sec. 513–e) in order to promote economy and efficiency in the public service. At the time of said amendment the city was already a metropolitan municipality of a million souls or more, with far-flung activities in the nature of public improvements and with a populous personnel comprising the usual municipal services. The council was authorized by section 33 of the charter to create the necessary positions, to authorize the necessary employees, to provide "suitable equipment" and to fix salaries, whereas the only authority for the employment of truck owners is contained in said ordinance 71539. But article IX of the charter creates a civil service which places all employees of the engineering department under a civil service classification in which each class includes all positions sufficiently similar in respect to the duties and responsibilities thereof in which the same requirements as to education, experience, knowledge and ability are demanded of incumbents; the same tests of fitness may be used in selecting qualified appointees and the same schedule of compensation may be equitably applied (sec. 100). Also, said article requires that applicants be examined in order fairly to test the relative capacity of those examined (sec. 103) ; that appointment be made from among those certified (sec. 109) ; that they may be discharged only for cause subject to review (sec. 112(a)) and that an employee can be paid no salary unless the payroll be certified by the civil service commission to the effect that the persons named on the list have been employed in accordance with said article IX.

When the retirement system was created in 1937 (art. XXXIV) the city had for years operated under said charter provisions both as to the operation of said civil service plan and as to the creation of all positions, officers and employees and their salaries. By said article all civil service employees automatically became members of the retirement system by operation of said section 502–A. But it is to be remembered that the employees to be replaced by more capable persons were those who held positions under civil service, that is, ser-

vice rendered for pay. In view of the foregoing provisions it was manifestly intended that said retirement system was to be applied to those persons holding positions created by the city council at a regular salary of $60 or more per month. If a truck owner is not an "employee" in the light of the foregoing, what is the authority for his presence among those in the city service?

For five years prior to the creation of said retirement system the only authority for employing truck owners was said ordinance 71539. It is an "ordinance providing for the operation of privately owned dump trucks", etc., and providing for the rentals to be paid therefor. It contains minimum requirements for the trucks and establishes classification and rates of pay. It provides that any truck so rented shall be directed by the city engineer; that its rental shall include all repairs, damages, depreciation, driver's wages, public liability, property damage and compensation insurance; that the owner furnish certain policies of insurance to protect persons and property against damage caused by negligent operation; that a substitute driver be furnished if the regular driver be absent; that a substitute truck be furnished if the rented truck be out of service, and that the driver shall perform such work as may be assigned to him by the engineer and shall furnish daily reports of his operation. It thus appears that by said ordinance a special provision was made for the city engineer to rent privately owned dump trucks at rates to include the wages of a driver; and that its authority is found in said section 33 of the charter to furnish "equipment and supplies for the various departments" and not in that section which employs the council to "create the necessary positions" and "fix salaries of employees". Nothing in said ordinance indicates its purpose to create any position for the truck owner. In the cases of all those widows whose trucks have continued in service under substitute drivers, surely it will not be claimed that the widow is an employee, since she does not work, or that her own hired man is a city employee, since his duty is to serve her. Under the ordinance any owner may lease his truck to the city with a hired driver in command. If he never drove his truck he would not be an employee. If he drove two days a week would that make him an employee? Moreover, if the council alone is authorized to create positions and to fix salaries of employees, to conclude that the

694

board of public works may give the status of "employee" to a truck owner, by any requirement would confer a power upon said board contrary to the language of the charter. If truck owners cannot be employed by the application of civil service rules, they cannot come within the category of employees as provided by said article IX, because they have not been given "tests of fitness" before entering their special line of service. Also, if an employee must undergo a test to determine his relative capacity to perform the duties of his position, the truck owner is, by the very fact of leasing his truck, removed from the circle of employees, because there is no mental test provided for a man who undertakes to furnish a truck to the city and none is suggested. The requirements expected of the owner are the type, age, power, speed and model of his truck. Those qualities may be beyond the ken of an examiner of intellectual attainments. Since all qualified civil service employees automatically became members of the retirement system July 1, 1937, plaintiffs, perforce, acknowledge that they are not of the civil service by applying to become members of the system. And if they are not of the civil service they are not employees, unless they can qualify as such under some distinct provision of the charter of which we have no knowledge.

■ Plaintiffs invoke the Workmen's Compensation Act and decisions thereunder to demonstrate that they are employees. The Labor Code does not control, although it makes an employee of "every person in the service of an employer" (sec. 3351). It is true that it has been held that in determining whether a person is an employee or an independent contractor it must be determined "who has the power of control as to the means and method by which the result is accomplished" (*Victory Auto P. Co.* v. *Industrial Acc. Com.*, 75 Cal. App. 729, 731 [243 Pac. 61]), and whether the employer has the right to terminate the service at his pleasure (*Hillen* v. *Industrial Acc. Com.*, 199 Cal. 577 [250 Pac. 570]). But these were cases arising under the Workmen's Compensation Act in which no factor entered into consideration as to whether the insured party was employee or independent contractor, except the nature of the contract of the parties. The definition of "employee" was taken from the act and conclusions were derived from the contractual relations. Neither case goes any further than to hold that any person "rendering service for another" is an employee if he is not

an independent contractor. In none of the cases cited was the commission confronted with the hiring by a city of a truck with driver to do a series of acts each day, under the direction of a foreman, with one compensation stipulated for both, as we have in the instant case. Moreover, the situation of the case at bar arose out of a city charter and ordinances enacted pursuant thereto. With reference to the contention that the status of plaintiffs should be governed by the language of the Workmen's Compensation Act, we are reminded that the legislature's approval of the city charter gave to that document force and vitality equal to that contained in any general statute. Said charter provision had to do primarily with gaining for the city the services of privately owned trucks, and not the hiring of human agencies in whom certain skill and efficiency are required. The fact that plaintiffs might be discharged at will is proof that they are not employees, because the department heads of the city are powerless to discharge employees except for cause and to the satisfaction of the civil service commission.

Where the charter makes specific provision for "appointments or assignments to particular positions, it is an essential condition to a recovery of the salary annexed to such position that the prescribed method of appointment or assignment be followed". (*Nash* v. *City of Los Angeles,* 78 Cal. App. 516, 519 [248 Pac. 689].) There is a rule prescribed by the Political Code (sec. 4482, tit. II) which provided that any chapter of a title which deals with a specific subject must prevail as to all matters and questions arising out of the subject-matter of such chapter. By analogy said rule may be applied to the city charter, which has made provision for the method of employing the personnel of the several departments of the city's service. The provision of that instrument, in purely municipal affairs, prevails over a general statute such as that contained in the Workmen's Compensation Act. (*Boyd* v. *City of Sierra Madre,* 41 Cal. App. 520 [183 Pac. 230]; *City of Pasadena* v. *Charleville,* 215 Cal. 384 [10 Pac. (2d) 745].)

Plaintiffs' reliance upon *Department of Water & Power* v. *Industrial Acc. Com.,* 220 Cal. 638 [32 Pac. (2d) 354], and *Fidelity etc. Co.* v. *Industrial Acc. Com.,* 191 Cal. 404 [216 Pac. 578, 43 A. L. R. 1304], and numerous decisions of sister states is unavailing for the reason that in the former the operator of a power shovel, loaned to the department by

the Mono Construction Company, was a "special" employee of the department and hence the city was liable for his injuries received in the course of his duty, and consequently for special compensation. It is true that in the Fidelity case it was held that an independent contractor is "one who renders service for a specific recompense, for a specified result, under the control of his principal as to the result of his work only, and not as to the means by which such result is accomplished". But that very decision demonstrates the distinction between cases arising under the Workmen's Compensation Act and those arising under a city charter providing for a retirement system for superannuated employees. Under the Workmen's Compensation Act an injured party has no right of recovery "unless the employer retains the right to direct the mode and manner in which the job shall be done". (*Fidelity etc. Co.* v. *Industrial Acc. Com., supra.*) But under that act we have no special provision for leasing trucks of various capacities at specified rates to include wages of a driver, repairs, etc. If proceedings be instituted under the Workmen's Compensation Act to recover for injuries received while serving another, the first question for decision is, Was the applicant working for the defendant or for himself? If he entered the defendant's employment at a stipulated wage to do only as directed, he is a workman; but if he engages to furnish and maintain a truck to haul freight to a distant point at a designated rate per ton, he is an independent contractor, as in the Fidelity case. And if killed en route his heirs have no master to compensate their losses. The framers of the charter of the city of Los Angeles, facing the prospect of the city's being compelled to supplement its own fleet of trucks, sought to do so by providing for the leasing of privately owned trucks to serve as occasion might arise. The economy of such a scheme is obvious. Merely because the nature of the work to be done by such trucks necessitated the administration of them and the direction of their drivers is no sound argument that their owners became city employees, even without complying with the other charter provisions for hiring through the civil service plan. Decisions applying the Workmen's Compensation Act shed no light upon the question involved in this case, because the city charter, which created the city employees' retirement system, established the civil service system and authorized the city council to make provision for the employment of the

personnel of the city service, is the paramount authority in municipal matters.

■ Plaintiffs' suggestion that pension statutes are to be liberally construed meets with a responsive chord. Of course, they are to be liberally construed, and it must be the wish not only of all parties to this litigation but very probably it is the wish of even the city council of said city that they might so liberalize the pension laws as to retire upon pension these plaintiffs as well as all other persons who have rendered any service over an extensive period and who have lived beyond the age of sixty years. But in the framing of the charter we must assume that its authors were governed by economic as well as humane considerations. At any rate, in arriving at a determination of the question whether these plaintiffs are employees of the city we must be controlled by the provisions of the charter and not by the desire of the plaintiffs, or of the city council or of this court. Since the language of the charter is free from ambiguity, and the ordinances enacted pursuant thereto are emphatic in their clarity, we are bound to resolve against the claims of plaintiffs.

■ Section 385 of the charter provides that every contract involving an expenditure of more than $500 shall, except in certain cases, be entered into in a particular manner. Plaintiffs undertake to convince us that because they have not executed a contract for a definite period of time for the use of their trucks they must therefore be employees. But they must know that the manner in which a contract may be entered into is not determinative of whether a contract is the end desired by the city and the truck owners at the time their relationships were created. Even though said ordinance 71539 was intended to require that a written contract be executed for the hiring of trucks, and even though such contract violated the provisions of section 385, those facts would not determine whether or not plaintiffs are employees or independent contractors. The fact that the agencies of the city may have been derelict in failing to require the execution of writings at the time of engaging the trucks could not make employees out of contractors contrary to law. ■ However, since it is conceded that plaintiffs are subject to discharge at any time, it must follow that they are engaged from day to day, which, in itself, renders inapplicable section 385 of the charter requiring a writing to evidence every contract for an expenditure in excess of $500.

██ These plaintiffs are not of the civil service and cannot claim under charter provisions regulating it, because they are not elective officials, or members of boards, or assistants or deputies of the city attorney, or any other of those especially exempted from civil service. Also, since they are not civil service employees their claim that they were ''blanketed into the classified civil service'' pursuant to section 121 of the charter has no basis, for the reason that on the effective date of said section they had not been in the ''classified civil service'' continuously ''for a period of six months prior to the adoption of this article''.

For the reasons indicated the judgment is affirmed.

Wood, J., and McComb, J., concurred.